# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WORLD WRESTLING ENTERTAINMENT, INC., | :   CASE NO. 3:15-CV-01204-VLB |
| | : |
| | : |
| Plaintiff, | : |
| VS. | : |
| | : |
| CTH CONTENT COMPANY LIMITED and CTH PUBLIC COMPANY LIMITED, | : |
| | : |
| | : |
| Defendants. | : |

## AFFIDAVIT OF JAMES W. LANGHAM

I, James W. Langham, being duly sworn, deposes and says:

1.      I am over 18 years old and believe in the obligations of an oath.

2.      I have personal knowledge of the matters set forth herein.

3.      I am Senior Vice President and Assistant General Counsel of Plaintiff World Wrestling Entertainment, Inc. ("WWE").  As part of my duties and responsibilities, I oversee WWE's agreements with international television and internet distributors, including WWE's agreement with Defendants CTH Content Company Limited ("CTHC") and CTH Public Company Limited ("CTH") (collectively, the "Defendants").

4.      I submit this affidavit in support of WWE's motion for entry of default judgment against the Defendants.

5.      WWE and CTHC entered into an International Television Rights License Agreement dated as of November 1, 2013 ("License Agreement"), pursuant to which WWE granted CTHC the exclusive but limited right and license to broadcast certain television programs in Thailand via Pay Television on the

broadcast channel owned by CTHC known as CTH Sports Channel and via any other means of retransmission on authenticated platforms owned or controlled by CTHC, subject to the terms, restrictions and limitations set forth in the License Agreement.  The period of the License Agreement commenced on January 1, 2014 and was scheduled to terminate on December 31, 2018.  A true and accurate copy of the License Agreement is attached hereto as Exhibit 1.

6.      Section 4 of the License Agreement provides that CTHC was required to pay to WWE a particular license fee for each of the specified television programs to which CTHC was granted rights under the License Agreement.  Section 4 of the License Agreement sets forth the amount of the license fees that CTHC is required to pay each year during the term of the License Agreement and a schedule by which such payments are to be made.  Section 4 also required CTHC to provide a Bank Guarantee in a specified amount each year (generally half of the total amount of license fees due in that year) during the term of the License Agreement and to provide WWE with copies of all documents evidencing such Bank Guarantee.

7.      Section 8 of the License Agreement provides in relevant part that "[t]his Agreement is subject to all of the provisions of the Standard Terms and Conditions that are attached to and made a part of this Agreement."

8.      Section A(1) of Standard Terms and Conditions to the License Agreement provides in relevant part that "[u]nless otherwise agreed to in writing Licensee shall pay WWE the total license fee due, whether or not the Programs are telecast, without any deduction or offset of any kind except as specified in the

Agreement, and notwithstanding any claim Licensee may have or claim to have, and whether or not the Licensee becomes aware of such claim during or after the expiration of termination of the Agreement."

9.      Section A(2) of the Standard Terms and Conditions to the License Agreement provides in relevant part that CTHC "shall pay WWE interest on any late payment at the lesser of (i) an annual rate of 2% over the prevailing prime interest rate in effect at JP Morgan Chase, New York, New York, on the date on which the outstanding amount of such late payment should have been received by WWE or (ii) the highest amount of interest allowed by applicable law."

10.     In accordance with the payment schedule in the License Agreement, WWE sent invoices to Defendants for payments due and owing under the License Agreement, including Invoice No. 95755 dated March 1, 2014 in the amount of $560,000.00, Invoice No. 97598 dated June 1, 2014 in the amount of $560,000.00, Invoice No. 99127 dated August 1, 2014 in the amount of $560,000.00, Invoice No. 100786 dated October 1, 2014 in the amount of $560,000.00, Invoice No. 102403 dated January 1, 2015 in the amount of $728,000.00, Invoice No. 102901 dated March 1, 2015 in the amount of $728,000.00, and Invoice No. 104680 dated June 1, 2015 in the amount of $728,000.00. A true and accurate copy of these invoices is attached hereto as Exhibit 2.

11.     Defendants never made any payments on the invoices sent by WWE that are attached hereto as Exhibit 2.

12.     Defendants also failed to pay $728,000.00 in license fees that were due to WWE on August 1, 2015 pursuant to the payment schedule set forth in the License Agreement.

13.     CTHC also never provided WWE with the Bank Guarantee that was required by the License Agreement.

14.     WWE made several attempts in good faith to contact CTHC regarding its repeated failures to make the payments required by the License Agreement.

15.     By letter dated October 23, 2014, WWE provided CTHC with a formal notice that CTHC was in breach of the License Agreement for non-payment of outstanding license fees then totaling $2,240,000.00.  A true and accurate copy of this letter is attached hereto as Exhibit 3.

16.     By letters dated May 22, 2015, WWE demanded payment from CTH and CTHC for the outstanding license fees due under the License Agreement then totaling $3,969,000.00, plus the interest accrued thereon at the rate prescribed in Section A(2) of the Standard Terms and Conditions calculated from the date that each license fee was due.  A true and accurate copy of these letters is attached hereto as Exhibit 4.

17.     As of August 1, 2015, CTHC's outstanding balance for license fees owed under the License Agreement totaled $5,152,000.00, exclusive of interest.

18.     Section K(1) of the Standard Terms and Conditions of the License Agreement provides:  "If Licensee breaches any of the material terms or provisions of this Agreement including, without limitation, any non-payment hereunder, and the Licensee fails to cure the breach within ten (10) days after

-4-

receiving written notice from WWE specifying the particulars of the breach, WWE shall have the right to terminate this Agreement immediately by giving written notice to Licensee."

19.     On August 14, 2015, WWE sent a formal notice terminating the License Agreement based on CTHC's material breaches of the License Agreement and failure to cure those breaches, including without limitation CTHC's non-payment of license fees under the License Agreement (the "Notice of Termination").  A true and accurate copy of the Notice of Termination is attached hereto as Exhibit 5.

20.     Section K(2) of the Standard Terms and Conditions of the License Agreement (the "Acceleration Clause") provides in relevant part that "upon the termination of this Agreement, all amounts due WWE by Licensee for Programs (i.e. the then remaining balance of the license fees due WWE as of the date of termination) shall become immediately due and payable to WWE."

21.     Pursuant to the Acceleration Clause, all license fees due to WWE under the License Agreement became immediately due and payable to WWE by CTHC upon termination of the License Agreement.  The remaining balance of unpaid license fees under the License Agreement totals $22,942,500.00, which includes the $5,152,000.00 in license fees that were already past due and owed by CTHC.  This sum does not include any fees or interest to which WWE is entitled pursuant to Section A(2) of the Standard Terms and Conditions.

22.     To date, Defendants have not paid WWE any of the outstanding amounts due and owing under the License Agreement.

23.     Defendants' failure to pay to WWE the license fees that are due and payable under the License Agreement constitutes a breach of the License Agreement.

24.     WWE has been damaged by Defendants' breach of the License Agreement.

25.     WWE is entitled to payment of all amounts due and payable under the License Agreement, including interest on all outstanding amounts in accordance with the Standard Terms and Conditions of the License Agreement.

26.     Defendants owe WWE the principal amount of $22,942,500.00, plus interest of $444,860.76, for a total amount of $23,387,360.76 owed under the License Agreement as of November 1, 2015.

27.     The table below summarizes the calculation of the amount owed by Defendants to WWE under the License Agreement based on the payment terms of the License Agreement and the contractual rate of interest provided by the License Agreement.  (*See* Exhibit 1 at ¶ 4.)

| AMOUNT OWED | DUE DATE | INTEREST RATE[1] | AMOUNT OWED PLUS INTEREST[2] |
|---|---|---|---|
| $560,000 | March 1, 2014 | 5.25% | $609,134.25 |
| $560,000 | June 1, 2014 | 5.25% | $601,723.84 |
| $560,000 | August 1, 2014 | 5.25% | $596,810.41 |
| $560,000 | October 1, 2014 | 5.25% | $591,896.99 |
| $728,000 | January 1, 2015 | 5.25% | $759,832.55 |
| $728,000 | March 1, 2015 | 5.25% | $753,654.52 |
| $728,000 | June 1, 2015 | 5.25% | $744,020.99 |
| $728,000 | August 1, 2015 | 5.25% | $737,633.53 |
| $728,000 | August 14, 2015[3] | 5.25% | $736,272.27 |
| $910,000 | August 14, 2015 | 5.25% | $920,340.34 |
| $910,000 | August 14, 2015 | 5.25% | $920,340.34 |
| $910,000 | August 14, 2015 | 5.25% | $920,340.34 |
| $910,000 | August 14, 2015 | 5.25% | $920,340.34 |
| $910,000 | August 14, 2015 | 5.25% | $920,340.34 |
| $1,137,500 | August 14, 2015 | 5.25% | $1,150,425.43 |
| $1,137,500 | August 14, 2015 | 5.25% | $1,150,425.43 |
| $1,137,500 | August 14, 2015 | 5.25% | $1,150,425.43 |
| $1,137,500 | August 14, 2015 | 5.25% | $1,150,425.43 |
| $1,137,500 | August 14, 2015 | 5.25% | $1,150,425.43 |
| $1,365,000 | August 14, 2015 | 5.25% | $1,380,510.51 |
| $1,365,000 | August 14, 2015 | 5.25% | $1,380,510.51 |
| $1,365,000 | August 14, 2015 | 5.25% | $1,380,510.51 |
| $1,365,000 | August 14, 2015 | 5.25% | $1,380,510.51 |
| $1,365,000 | August 14, 2015 | 5.25% | $1,380,510.51 |
| $22,942,500 | | | $23,387,360.76 |

28.    Accordingly, WWE is entitled to payment of the liquidated amount of

$23,387,360.76 from the Defendants under the License Agreement.

---

[1] Section A(2) of Standard Terms and Conditions to the License Agreement provides that the interest rate is "an annual rate of 2% over the prevailing prime interest rate in effect at JP Morgan Chase, New York, New York, on the date on which the outstanding amount of such late payment should have been received by WWE." The prevailing prime interest rate during this time period was 3.25%. (http://www.jpmorganchase.com/corporate/About-JPMC/historical-prime-rate.htm). Therefore, the contractual interest rate during this period was 5.25%.

[2] This represents the amount owed plus interest as of November 1, 2015.

[3] Pursuant to the Acceleration Clause, all license fees due to WWE under the License Agreement became immediately due and payable to WWE upon termination of the License Agreement on August 14, 2015.

_____

James W. Langham, Esq.

Sworn to before me this 26th day of October, 2015.

_____

**Notary Public**
**My Commission Expires:** 11/30/18

AMY L. ANNUCCI
NOTARY PUBLIC
MY COMMISSION EXPIRES NOVEMBER 30, 2018

EXHIBIT 1

CTH

## WORLD WRESTLING ENTERTAINMENT, INC.
## INTERNATIONAL TELEVISION RIGHTS LICENSE AGREEMENT

THIS INTERNATIONAL TELEVISION RIGHTS LICENSE AGREEMENT ("Agreement"), dated as of November 1, 2013, is made and entered into by and between WORLD WRESTLING ENTERTAINMENT, INC., a Delaware corporation with its principal office at 1241 East Main Street, Stamford, Connecticut 06902, U.S.A. ("WWE"), and CTH CONTENT COMPANY LIMITED, with offices at 96/1 Chalermprakiat Ror 9 Road, Nong Bon, Prawet, Bangkok 10250, Thailand ("Licensee") (collectively the "Parties").

In consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      For purposes of this Agreement, the following definitions shall apply:

(a)      The term "Advertising Materials" shall mean any and all advertising and promotional materials related to the Programs which references or exploits the Intellectual Property.

(b)      The term "Basic Charges" shall mean (a) charges directly relating to the reception of or provision of access to (as opposed to content of) one or more television services particularly which comprise regular periodic charges or license fees or (b) government taxes payable by or to owners of television receivers to receive the relevant service.

(c)      The term "Broadband Programming" shall mean any programming that may be distributed via any form of telecommunication system that provides multiple channels of data at high speeds.

(d)      The term "Broadcast Television" shall mean "over-the-air" conventional broadcast television which is capable of reception by the public by means of standard home antennae and/or aerials including terrestrial microwave transmissions, so-called "over-the-air" pay subscription television and multi-point distribution services but excluding Direct Broadcasting by Satellite and Cable Television.

(e)      The term "Cable Television" shall mean the transmission from a fixed point within the Territory of an uplink signal from that point to a satellite and the retransmission of the same from such satellite in a beam aimed towards the Territory for:

(a)      reception by the operators of receiving antennae; and

(b)      redistribution by such operator either by cable to those households or other subscribers connected to such operators' relay systems or by terrestrial re-broadcast by means of an encrypted signal or any closed circuit television system for reception by the occupants of dwellings and other buildings in multiple occupation;

but specifically excluding Broadcast Television and Direct Broadcasting by Satellite.

APPROVED BY CTH LEGAL [...]

(f)     The term "Copyrights" shall mean all copyrights now or hereafter owned by WWE relating to the Programs which includes but is not limited to the Talent appearing or shown within the Programs and/or the Events from which the Programs are derived.

(g)     The term "Direct Broadcasting by Satellite" shall mean the transmission from a fixed point within the Territory of an uplink signal from that point to a satellite and the retransmission of the same from such satellite in a beam aimed towards the Territory for reception by those members of the public possessing a satellite dish and/or any other receiving and decoding equipment necessary in order to receive the same in an intelligible form, but specifically excluding Broadcast Television and Cable Television.

(h)     The term "Distribution System" shall mean any and all forms of television distribution (other than Pay-Per-View, video on demand, subscription video on demand and similar distribution systems), whether now existing or hereafter developed, whether analogue, digital or otherwise, and whether point to multipoint or point to point including Broadcast Television, Cable Television and Direct Broadcasting by Satellite but excluding any non-television distribution such as, by way of example and not exclusively, through Broadband Programming, On-Line Service, Mobile Service, Interactive Service, Non-Theatrical Distribution, Radio Service, Theatrical Distribution and Video Distribution.

(i)     The term "Events" shall mean certain professional wrestling events produced, promoted and performed by WWE, whether live or tape delayed, whether via television, satellite or any other method of dissemination and distributed to Licensee by WWE provided, however, that the foregoing definition of "Events" shall not include (i) any events created for Internet programming; (ii) any events created for Broadband Programming; (iii) any comic, cartoon or animated events; or (iv) any characters, characterizations, designs or visual representations derived from any of the foregoing exceptions including, without limitation, any depictions taken from comic books, magazines, animated television programs and comic, cartoon or animated Internet or Broadband Programming events, in general, even if such comic, cartoon or animated events, characters, characterizations, designs or visual representations are subsequently produced, promoted, performed or created by WWE.

(j)     The term "Free Television" shall mean a programming service that originates as Broadcast Television but may also be distributed simultaneously and linearly through compulsory license or "must carry" rules via other Distribution Systems so long as it is done without charge (other than Basic Charges) to the intended viewer.

(k)     The term "Intellectual Property" shall mean the Rights of Publicity, the Trademarks, Copyrights and all other proprietary rights related to the Talent, the Events and/or the Programs as exploited from time to time by WWE in its sole discretion, which includes without limitation any and all rights related thereto such as patents, trade marks, service marks, rights in design, trade or business names, copyrights (including future copyright and rights in the nature of or analogous to copyrights), get-up and topography rights, rights in inventions, know-how, trade secrets and other confidential information, rights in databases and all other intellectual property rights of a similar or corresponding nature which may subsist in any part of the world whether or not now existing and whether or not... registered or registerable which includes any right to apply for registration of such rights and includes all renewals and extensions thereof.

2

APPROVED BY CTH LEGAL DEPT

(l)     The term "Interactive Service" shall mean any service or systems which distributes, transmits and/or exhibits audio and/or audiovisual programming (or any part thereof) which allows the recipient to interrupt the linear reception of such programming and/or manipulate or interact with the content thereof.

(m)     The term "Internet" shall mean the system for the delivery or provision of access to any audio, visual or other materials making use of the software protocols known as TCP (transmission control protocol)/IP (internet protocol) known as "the Internet" or "Worldwide Web", whatever the communications link or links may be, which connects the user (whether, without limitation, by fixed, mobile WAP, DSL, ISDN or other broadband links), and also includes any developments in such protocols and also any other protocols which may in the future be developed or adopted which give equivalent, reduced or enhanced functionality compared with such protocols (including, without limitation, any system involving reduced access known as Web TV).

(n)     The term "Mobile Service" shall mean any service now known or hereafter devised for the delivery or provision of access to any person, to any data, text, visual images, audio, or audiovisual material where that material is intended for reception by way of mobile telephone or other mobile apparatus making use of the radio spectrum allocated to mobile telephony or UMTS services.

(o)     The term "Non-Theatrical Distribution" shall mean the transmission of the signal of a Program by means of any technology for exhibition to closed user groups, hotels, restaurants, bars, educational institutions (including schools, public libraries, colleges, universities, dormitories and residence halls), armed forces, churches, museums, summer camps, commercial premises, business and industry, the transportation industry (including on airplanes, shops and trains) and organizations of an educational, cultural, religious, charitable or social nature including drama groups, film societies and professional associations and to all other like entities.

(p)     The term "On-Line Service" shall mean any service now known or hereafter devised for the delivery or provision of access to any person to the Internet.

(q)     The term "Pay Per View" shall mean the exhibition of programming chosen by a viewer(s) for which reception that viewer is required to pay an individual exhibition fee for exhibition of the programming as opposed to such payment being on a pre-packaged, subscription basis; it being understood and agreed that Pay Per View shall also include the exhibition of programming on a Near Video on Demand, Virtual Video on Demand, Personal Video Recorder or Video on Demand basis, as those terms are customarily understood in the industry, but shall exclude Non-Theatrical Distribution and Theatrical Distribution.

(r)     The term "Pay Television" shall be deemed to mean any television programming service which may be viewed via a Distribution System in return for the payment of a charge (such charge being a regular payment but other than Basic Charges).

(s)     The term "Programs" shall mean the television programs, sound or picture recordings and/or cinemagraphic films derived from certain Events as provided by WWE to Licensee and as more specifically identified by the following titles:

*APPROVED BY CTH LEGAL*

3

(1)   "Sequential Programs" shall mean the following WWE programming titles broadcast in sequential, numerical episodic order:

a)   Two hundred sixty (260) weekly sequential episodes of "3 Hour Raw" starting with episode number 1076 and continuing in order through episode number 1335;

b)   Two hundred sixty (260) weekly sequential episodes of "SmackDown" starting with episode number 750 and continuing in order through episode number 1009;

c)   Two hundred sixty (260) weekly sequential episodes of "Main Event" starting with episode number 66 and continuing in order through episode number 325;

d)   Two hundred sixty (260) weekly sequential episodes of "Superstars" starting with episode number 247 and continuing in order through episode number 506;

e)   Two hundred sixty (260) weekly sequential episodes of "NXT" starting with episode number 203 and continuing in order through episode number 462;

f)   Two hundred sixty (260) weekly sequential episodes of "BottomLine" starting with episode number 607 and continuing in order through episode number 866;

g)   Two hundred sixty (260) weekly sequential episodes of "AfterBurn" starting with episode number 607 and continuing in order through episode number 866;

h)   Two hundred sixty (260) weekly sequential episodes of "Vintage Collection" starting with episode number 292 and continuing in order through episode number 551;

i)   Two hundred sixty (260) weekly sequential episodes of "WWE Experience" starting with episode number 506 and continuing in order through episode number 765; and

j)   Two hundred sixty (260) weekly sequential episodes of "This Week in WWE" starting with episode number 258 and continuing in order through episode number 517.

(2)   "Special Programs" defined to be the following WWE programming titles derived from certain Events, all of which have been shown as Pay Per View in the United States;

a)   Five (5) episodes of the special entitled "Royal Rumble"; the first scheduled for broadcast in January 2014; the second scheduled for broadcast in January 2015; the third scheduled for broadcast in

4

January 2016; the fourth scheduled for broadcast in January 2017 and the fifth scheduled for broadcast in January 2018;

b) Five (5) episodes of the special entitled "<u>Elimination Chamber</u>"; the first scheduled for broadcast in February 2014; the second scheduled for broadcast in February 2015; the third scheduled for broadcast in February 2016; the fourth scheduled for broadcast in 2017 and the fifth scheduled for broadcast in February 2018;

c) Five (5) episodes of the special entitled "<u>WrestleMania</u>"; the first scheduled for broadcast in April/May 2014; the second scheduled for broadcast in April/May 2015; the third scheduled for broadcast in April/May 2016; the fourth scheduled for broadcast in April/May 2017 and the fifth scheduled for broadcast in April/May 2018;

d) Five (5) episodes of the special entitled "<u>Extreme Rules</u>"; the first scheduled for broadcast in May 2014; the second scheduled for broadcast in May 2015; the third scheduled for broadcast in May 2016; the fourth scheduled for broadcast in May 2017 and the fifth scheduled for broadcast in May 2018;

e) Five (5) episodes of the special entitled "<u>No Way Out</u>"; the first scheduled for broadcast in June 2014; the second scheduled for broadcast in June 2015; the third scheduled for broadcast in June 2016; the fourth scheduled for broadcast in June 2017 and the fifth scheduled for broadcast in June 2018;

f) Five (5) episodes of the special entitled "<u>Money in the Bank</u>"; the first scheduled for broadcast in July 2014; the second scheduled for broadcast in July 2015; the third scheduled for broadcast in July 2016; the fourth scheduled for broadcast in July 2017 and the fifth scheduled for broadcast in July 2018;

g) Five (5) episodes of the special entitled "<u>SummerSlam</u>"; the first scheduled for broadcast in August 2014; the second scheduled for broadcast in August 2015; the third scheduled for broadcast in August 2016; the fourth scheduled for broadcast in August 2017 and the fifth scheduled for broadcast in August 2018;

h) Five (5) episodes of the special entitled "<u>Night of Championships</u>"; the first scheduled for broadcast in September 2014; the second scheduled for broadcast in September 2015; the third scheduled for broadcast in September 2016; the fourth scheduled for broadcast in September 2017 and the fifth scheduled for broadcast in September 2018;

i) Five (5) episodes of the special entitled "<u>WWE Over the Limit</u>"; the first scheduled for broadcast in October 2014; the second scheduled for broadcast in October 2015; the third scheduled for broadcast in October 2016; the fourth scheduled for broadcast in

5

APPROVED BY CTH LEGAL DEPT

October 2017 and the fifth scheduled for broadcast in October 2018;

j) Five (5) episodes of the special entitled "Hell in a Cell"; the first scheduled for broadcast in October 2014; the second scheduled for broadcast in October 2015; the third scheduled for broadcast in October 2016; the fourth scheduled for broadcast in October 2017 and the fifth scheduled for broadcast in October 2018;

k) Five (5) episodes of the special entitled "Survivor Series"; the first scheduled for broadcast in November 2014; the second scheduled for broadcast in November 2015; the third scheduled for broadcast in November 2016; the fourth scheduled for broadcast in November 2017 and the fifth scheduled for broadcast in November 2018;

l) Five (5) episodes of the special entitled "WWE TLC: Tables, Ladders & Chairs"; the first scheduled for broadcast in December 2014; the second scheduled for broadcast in December 2015; the third scheduled for broadcast in December 2016; the fourth scheduled for broadcast in December 2017 and the fifth scheduled for broadcast in 2018.

Notwithstanding any other provisions hereof, Licensee recognizes that WWE, in its sole creative discretion, may from time to time change the titles, formats and other creative aspects of the Programs, which WWE will use reasonable efforts to communicate to Licensee, and no such change shall affect the enforceability, terms or conditions of this Agreement, with all such changed Programs replacing their former versions as Programs for all purposes hereof.

(t)     The term "Radio Service" shall mean any service now known or hereafter devised for the delivery or provision of access to any person of any audio material whether or not also accompanied by data via radio teletext or otherwise including any still or moving pictures.

(u)     The term "Rights of Publicity" shall mean the likenesses, physical characteristics, personalities, characters, and personas of the Talent.

(v)     The term "Talent" shall mean all individuals who perform in or at the Events, including the professional wrestlers who perform in the Events.

(w)     The term "Television Service" shall mean any service for the delivery or provision of access to Viewers of audiovisual material, excluding any On-Line Service and Radio Service, but including Direct Broadcasting by Satellite, Broadcast Television and Cable Television.

(x)     The term "Territory" shall mean the geographical areas within the country of Thailand; provided, however, if at any time a trade embargo under United States law applies to the licensing of the Programs in any such country, it shall be suspended from the effectiveness of this license automatically for the full duration of such embargo, and

APPROVED BY CTH LEGAL DEPT

6

Licensee shall not air the Programs during such period. Upon the termination of such embargo as to any country, the license with respect to such country shall resume.

(y)     The term "Theatrical Distribution" shall mean the transmission or exhibition of the signal of a Program by means of any technology for exhibition to or in public areas, stadia, cinemas or theatres, whether as free events or for a charge.

(z)     The term "Trademarks" shall mean all symbols, designs, styles, emblems, logos and marks now or in the future owned and/or controlled by WWE and used in connection with the Programs, including, but not limited to, the name WORLD WRESTLING ENTERTAINMENT, INC. WWE logo or logos, the logos and marks for the Events and the names, logos, marks, sayings and other distinctive indicia of the Talent, but excluding the initials WWF.

(aa)     The term "Video Distribution" shall mean the copying, distribution and/or exhibition of Videos including without limitation all forms of "home video", "commercial video", "video sell through" and "video rental".

(bb)     The term "Video" shall mean (i) a tangible copy of recording made of any disc, cassette or other storage device now known or hereafter invented or discovered; or (ii) a digital download of such recording, in each case designed to be used in conjunction with reproduction apparatus which causes a picture to be visible to the viewer.

(cc)     The term "Viewer" shall mean any person who possesses any receiving and/or decoding equipment necessary in order to receive and/or decrypt any Television Service.

2.     License

(a)     Grant of License: Subject to the terms, restrictions and limitations set forth in this Agreement, including without limitation Section E and K(3) of the Standard Terms and Conditions hereto, WWE grants to Licensee the exclusive (to the extent provided below) but limited right and license, during the Period of Agreement to broadcast the Programs in the English and Thai language via Pay Television on the Licensee owned broadcast channel designated CTH Sports Channel(s) and available on the basic tier (hereinafter referred to as the "Channel") within the Territory; and simulcast (i.e. as a part of same linear feed and not on a video on demand or delayed basis) broadcast via any other means of retransmission on authenticated Licensee owned/controlled/branded platforms, including digital platforms and IPTV. Licensee may sublicense one or more Programs to a free to air channel in the Territory for the purpose of broadening the WWE audience and promoting WWE on the Licensee's pay television platform. As a condition to this Agreement, Licensee shall guarantee that any and all of its subsidiaries, affiliates, agents and/or representatives including without limitation the Channel are in compliance with any and all of the terms, conditions and directives set forth herein during the Period of Agreement.

(b)     License Limited. Notwithstanding anything to the contrary herein, Licensee shall not:

(i)     save in respect of its right to broadcast via Pay Television as described in clause 2(a), make any transmission, distribution or

APPROVED BY CTH LEGAL DEPT

7

exhibition of all or any part of the Programs via any form of distribution or dissemination or any system for the delivery or provision of access to audiovisual material now known or hereinafter devised, including without limitation by any other Distribution System, On-Line Service, Mobile Service, Radio Service, or Interactive Service, or via any Non-Theatrical Distribution, Video Distribution, or Theatrical Distribution; or

(ii)　transmit the Programs on a Pay Per View basis.

To that end, except where elsewhere provided herein, any and all methods of distribution for the Programs are reserved by WWE for its own use, and to license same to · third parties.

(c)　Holdback: Except as otherwise noted to the contrary by the terms and conditions of the Agreement, during the Period of Agreement and solely within the Territory, WWE shall not authorize any party other than Licensee to exhibit via Pay Television the Programs in their entirety.

(d)　Limited Use of the Programs By WWE: Notwithstanding Section 2(c), (x) WWE can use and license all or any portion of the Programs via On-Line Service, Broadband Programming, any Distribution System (other than Pay Television) or any other manner of distribution (i.e., video on demand, subscription video on demand and similar distribution systems, Pay Per View, Interactive Service, Mobile Service, Non-Theatrical Distribution, Theatrical Distribution, etc.) in the Territory during the Period of Agreement, and (y) WWE may use clips and/or excerpts of or from any Programs as part of or within any other programming now known or hereinafter discovered, as WWE shall determine in its sole discretion, and all such programming may be shown via a Distribution System or any other manner of distribution (i.e., Pay Per view, Interactive Service, Mobile Service, Non-Theatrical Distribution, Theatrical Distribution, etc.) in the Territory during the Period of Agreement. WWE shall also have the right to incorporate the Programs, in part or in their entirety, into Video(s), for sale and distribution within the Territory by WWE or WWE's authorized distributor.

(e)　Promotional Uses By Licensee: Licensee shall have the right to transmit excerpts taken from the Programs not to exceed thirty seconds (:30) in duration from each Program (excluding finishes), for promotional use within the Territory on the Channel, provided WWE approves the excerpts and use thereof in advance, and provided further that the excerpts of the Programs are used solely to promote and market WWE and/or the broadcast of the Programs by Licensee on the Channel ("Promotional Excerpts"). Licensee shall not cut and insert the Promotional Excerpts into other Licensee programming and shall not broadcast the Promotional Excerpts in "Stripped" form, as that term is customarily understood.  Instead, Licensee shall only exploit the Promotional Excerpts via commercials and as bumpers to Licensee programming.

(f)　Pay Per View Market Exception: Should the potential for Pay Per View emerge within the Territory, WWE reserves the right, upon ninety (90) days notice to Licensee, to "take back" Licensee's right to broadcast, transmit, and/or otherwise exploit (including any such assignments, transfers or sublicensing rights related thereto) any one or more of the Special Programs ("Pay Per View Opportunities"). In such case, WWE shall use commercially reasonable efforts to offer the Pay Per View Opportunities to Licensee first and

APPROVED BY CTH LEGAL DEPT

WWE – CTH Content Company (Thailand 2014-2018) Long Form.docx

shall allow Licensee a period of thirty (30) days to determine if it is interested in such Pay Per View Opportunities. Upon expiration of the thirty (30) day window, WWE is free to proceed and offer licenses for such Pay Per View Opportunities to any other third party WWE chooses. In the event one or more Special Programs pursuant to this subparagraph 3(d) is taken back, it shall not be a breach of this Agreement by WWE, but Licensee shall be entitled to a credit in the amount of the license fees relating to such taken Special Program(s). It is understood that WWE may license the Programs via Pay-Per-View without taking back any of the Special Programs.

        (g)    <u>Voiceover</u>: WWE shall provide a descriptive breakdown of the content for each episode of the Programs to assist the Licensee's production of a voiceover. Licensee shall submit a sufficient sample of its chosen voiceover artist voicing a Program as soon as is reasonably practicable following delivery of the Materials in order to enable WWE to approve the voiceover artist in writing. At any time during the Term, WWE shall be entitled to insist the voiceover artist is replaced if, in the reasonable opinion of WWE and taking into account local market preferences and local audience tastes, the voiceover artist is in any way not in keeping with the standards of WWE and/or the Programs.

        (h)    <u>Takeback</u>: Notwithstanding any other provision herein, on ninety (90) days prior written notice, WWE may terminate this Agreement in whole or as to any one or more Program(s) to the extent deemed by WWE to be necessary or beneficial in its creation and/or roll out of a WWE-branded network in the Territory. In case of such termination, the allocable portion of the license fees for the affected Program(s) shall be deleted for the period beginning upon such termination. Notwithstanding any other provision herein relating to exclusivity or otherwise, nothing contained herein shall preclude WWE from including any Program or Programs in any WWE-branded network and distributing such network in the Territory during the Period of Agreement, via any and all means of distribution, including without limitation any Distribution System.

3.    <u>Period of Agreement</u>.

        (a)    The period of this Agreement shall commence on January 1, 2014 and shall end on December 31, 2018 ("Period of Agreement").

        (b)    Notwithstanding anything to the contrary herein, WWE shall have the right to terminate this Agreement immediately by written notice to Licensee in whole if WWE programming from which the Programs are derived is no longer broadcast within the United States and shall have the right to terminate this Agreement immediately by written notice to Licensee in part as to any specific Program if WWE programming from which such Program is derived is no longer broadcast within the United States.

        (c)    In the event this Agreement is terminated (wholly or partially) pursuant to Section 3(b), such termination shall not constitute a breach hereof or entitle Licensee to any remedy whatsoever; provided, however, WWE shall reimburse license fees already paid to WWE by Licensee pursuant to Section 4 below for Programs not yet delivered or transmitted to Licensee on the date of termination.

4.    <u>Payments to WWE</u>.

| Programs | | Total | Price Per Episode |
|---|---|---|---|
| License Fee: | <u>Year 1 – 2014</u> | | |

*APPROVED BY CTH LEGAL DEPT*

9

| | | |
|---|---|---|
| 3 hr RAW | $700,000 | $13,461.54 |
| SmackDown | $560,000 | $10,769.23 |
| Main Event | $280,000 | $5,384.62 |
| Superstars | $280,000 | $5,384.62 |
| NXT | $84,000 | $1,615.38 |
| BottomLine | $140,000 | $2,692.31 |
| AfterBurn | $280,000 | $5,384.62 |
| Vintage Collection | $56,000 | $1,076.92 |
| WWE Experience | $140,000 | $2,692.31 |
| This Week in WWE | $140,000 | $2,692.31 |
| PPV | $140,000 | $11,666.67 |
| | $2,800,000 | Sub – |

**Total**

**Licensee shall provide a Bank Guarantee for the amount of $1,400,000 in Year 1. Licensee shall provide WWE with copies of all documents evidencing such Bank Guarantee.**

**Year 2 - 2015**

| | | |
|---|---|---|
| 3 hr RAW | $910,000 | $17,500 |
| SmackDown | $728,000 | $14,000 |
| Main Event | $364,000 | $7,000 |
| Superstars | $364,000 | $7,000 |
| NXT | $109,200 | $2,100 |
| BottomLine | $182,000 | $3,500 |
| AfterBurn | $364,000 | $7,000 |
| Vintage Collection | $72,800 | $1,400 |
| WWE Experience | $182,000 | $3,500 |
| This Week in WWE | $182,000 | $3,500 |
| PPV | $182,000 | $15,166.67 |
| | $3,640,000 | Sub – |

**Total**

**Licensee shall provide a Bank Guarantee for the amount of $1,820,000 in Year 2. Licensee shall provide WWE with copies of all documents evidencing such Bank Guarantee.**

**Year 3 - 2016**

| | | |
|---|---|---|
| 3 hr RAW | $1,137,500 | $21,875 |
| SmackDown | $910,000 | $17,500 |
| Main Event | $455,000 | $8,750 |
| Superstars | $455,000 | $8,750 |
| NXT | $136,500 | $2,625 |
| BottomLine | $227,500 | $4,375 |
| AfterBurn | $455,000 | $8,750 |
| Vintage Collection | $91,000 | $1,750 |
| WWE Experience | $227,500 | $4,375 |
| This Week in WWE | $227,500 | $4,375 |
| PPV | $227,500 | $18,958.33 |

*APPROVED BY CTH LEGAL DEPT*

10

|       |   $4,550,000 | Sub - |
|-------|-------------|-------|
| Total |             |       |

Licensee shall provide a Bank Guarantee for the amount of $2,275,000 in Year 3. Licensee shall provide WWE with copies of all documents evidencing such Bank Guarantee.

| Year 4 - 2017 | | |
|---------------|-----------|-----------|
| 3 hr RAW | $1,421,875 | $27,343.75 |
| SmackDown | $1,137,500 | $21,875 |
| Main Event | $568,750 | $10,937.50 |
| Superstars | $568,750 | $10,937.50 |
| NXT | $170,625 | $3,281.25 |
| BottomLine | $284,375 | $5,468.75 |
| AfterBurn | $568,750 | $10,937.50 |
| Vintage Collection | $113,750 | $2,187.50 |
| WWE Experience | $284,375 | $5,468.75 |
| This Week in WWE | $284,375 | $5,468.75 |
| PPV | $284,375 | $23,697.92 |
| | $5,687,500 | Sub - |

Total

Licensee shall provide a Bank Guarantee for the amount of $2,843,000 in Year 4. Licensee shall provide WWE with copies of all documents evidencing such Bank Guarantee.

| Year 5 - 2018 | | |
|---------------|-----------|-----------|
| 3 hr RAW | $1,706,250 | $32,812.50 |
| SmackDown | $1,365,000 | $26,250 |
| Main Event | $682,500 | $13,125 |
| Superstars | $682,500 | $13,125 |
| NXT | $204,750 | $3,937.50 |
| BottomLine | $341,250 | $6,562.50 |
| AfterBurn | $682,500 | $13,125 |
| Vintage Collection | $136,500 | $2,625 |
| WWE Experience | $341,250 | $6,562.50 |
| This Week in WWE | $341,250 | $6,562.50 |
| PPV | $341,250 | $28,437.50 |
| | $6,825,000 | Sub - |

Total

Licensee shall provide a Bank Guarantee for the amount of $3,412,500 in Year 5. Licensee shall provide WWE with copies of all documents evidencing such Bank Guarantee.

*APPROVED BY CTH LEGAL DEPT*

|   $23,502,500 | Total |
|---------------|-------|

Payment Terms:                         Year 1 - 2014

WWE – CTH Content Company (Thailand 2014-2018) Long Form.docx

| $560,000 | 1 Jan 2014 |
| $560,000 | 1 March 2014 |
| $560,000 | 1 June 2014 |
| $560,000 | 1 August 2014 |
| $560,000 | 1 Oct 2014 |
| **$2,800,000** | **Sub-Total** |

**Year 2 - 2015**

| $728,000 | 1 Jan 2015 |
| $728,000 | 1 March 2015 |
| $728,000 | 1 June 2015 |
| $728,000 | 1 August 2015 |
| $728,000 | 1 Oct 2015 |
| **$3,640,000** | **Sub-Total** |

**Year 3 - 2016**

| $910,000 | 1 Jan 2016 |
| $910,000 | 1 March 2016 |
| $910,000 | 1 June 2016 |
| $910,000 | 1 August 2016 |
| $910,000 | 1 Oct 2016 |
| **$4,550,000** | **Sub-Total** |

**Year 4 - 2017**

| $1,137,500 | 1 Jan 2017 |
| $1,137,500 | 1 March 2017 |
| $1,137,500 | 1 June 2017 |
| $1,137,500 | 1 August 2017 |
| $1,137,500 | 1 Oct 2017 |
| **$5,687,500** | **Sub-Total** |

**Year 5 - 2018**

| $1,365,000 | 1 Jan 2018 |
| $1,365,000 | 1 March 2018 |
| $1,365,000 | 1 June 2018 |
| $1,365,000 | 1 August 2018 |
| $1,365,000 | 1 Oct 2018 |
| **$6,825,000** | **Sub-Total** |

(b)   <u>Tax</u>:  Unless otherwise specifically provided for in Section A(5) of the Standard Terms and Conditions hereto, all license fees paid by Licensee to WWE shall be exclusive of any and all taxes applicable within the Territory including, without limitation, withholding or remittance taxes, value added taxes ("VAT"), goods and services taxes ("GST"), agent commissions, import or export taxes, import or export permits or similar levies, or any other fees or charges imposed against Licensee or WWE, and it shall be Licensee's sole and absolute responsibility to pay any such taxes.  Licensee shall pay any taxes chargeable to the Programs and/or this Agreement upon WWE's written demand.

(c)   <u>Cost of Exhibition of Programs</u>.  Licensee shall be responsible for all of its respective costs and expenses arising in connection with the exercise of any and all

*APPROVED BY CTH LEGAL DEPT*

rights under this Agreement including, without limitation, all reception and decoding equipment, all transmission, and/or all other equipment processes, software and other intellectual property used by Licensee to broadcast, transmit and exhibit the Programs to Licensee's Viewers (collectively, the "Distribution System"). Licensee shall indemnify and hold the WWE Parties (as defined in Section G(1)) harmless from any and all claims relating to intellectual property infringement relating to the Distribution System.

5. Scheduling; Reports.

(a)   Scheduling as it relates to Licensee: Each of the Programs shall be broadcast by Licensee on the Channel within the Territory in the sequential, numerical episodic order directed by WWE and in a consistent weekly time slot approved in advance by WWE after reasonable consultation without preemptions or other interruptions. The approved time slots for the first exhibitions of the Programs are listed in Exhibit A. Licensee shall broadcast the Programs in their order in the context of all WWE programming (including the Programs) as such order is set forth in Exhibit B attached hereto. Such order may be changed or updated from time to time by WWE during the Period of Agreement ("Program Order"). Each of the Sequential Programs shall be broadcast on a two (2) week delay from the dates of their broadcast in the United States. Any disputes in program scheduling between WWE and/or Licensee shall be first discussed in the good faith between the parties and if a resolution can not be reached with five (5) business days, then it shall be resolved in accordance with the best interests of WWE programming, as determined by WWE in its sole discretion.

(b)   Sequencing:   In addition to the broadcast of the Programs in Program Order, Licensee shall ensure that the broadcast of each individual Program title shall be in accordance with each individual Program title's correct episodic sequence as directed by WWE. Consequently, the scheduling and broadcast of the Programs by Licensee shall not, under any circumstances whatsoever, disturb its own individual sequential, episodic nature or the sequential, episodic nature of the Program Order in general.   As means of ensuring compliance with the scheduling and broadcast requirements herein, the parties have agreed to a schedule for the broadcast of the Programs (including Replays), which is annexed hereto as Exhibit A (Note: Any change to said schedule must be approved by WWE).

(c)   Replays: Licensee shall broadcast each episode of the Programs once originally and one (1) time as a replay (the "Replay") on the Channel unless otherwise directed by WWE. Timeslots for Replays shall be agreed to by WWE. None of the Replays, however, shall be broadcast after the original broadcast of the next sequentially ordered WWE program as set forth in Exhibit B, whether it be the next scheduled broadcast of an episode of the Programs or the next scheduled broadcast in the Territory of an episode of any other WWE Programming within the Territory.

6.   (Further Agreements; Broadcast of Other Wrestling and Mixed Martial Arts Programs: Licensee on behalf of itself and the Channel and its and their parent companies, subsidiaries, affiliates, successors and assigns (for all purposes of this Section 6 and Section L(15) of the Standard Terms and Conditions, collectively "Licensee") agree that they shall not, while this Agreement remains in effect, produce, broadcast or telecast programs, produce any products or provide any services (including, without limitation, airing any advertisements, promotions or sponsorships) using the names, talent logos, trademarks, service marks or other intellectual property associated with any United States professional

APPROVED BY CTH LEGAL LEFT

13

wrestling organization other than WWE and its affiliates and subsidiaries ("collectively "Non-WWE Wrestling").

      7.    Licensee Acknowledgment. Licensee has reviewed and understands all provisions of this Agreement, including the attached Standard Terms and Conditions.

      8.    Standard Terms and Conditions. This Agreement is subject to all of the provisions of the Standard Terms and Conditions that are attached to and made a part of this Agreement. If any provision of this Agreement shall conflict with any of the provisions of the Standard Terms and Conditions, the terms of this Agreement shall prevail.

      9.    Material Conditions.    Each of Licensee's representations, warranties, covenants and other obligations are material, and the breach of any such representations, warranties, covenants or obligations may result in immediate termination. If WWE terminates this Agreement in accordance with the provisions of this Agreement, Licensee shall remain obligated to pay to WWE all license fees due WWE as of the date of termination and such termination and payment of license fees due shall not limit any other remedies WWE may have in respect of any breach resulting in such termination.

      10.    Attorney Acknowledgement. Each of the parties have reviewed the terms of this Agreement, have participated in the drafting of this Agreement and have executed the Agreement, in each case, with the advice and consent of their attorneys. The language of this Agreement shall not be presumptively construed in favor of or against any party hereto.

      11.    Agreement Signed in Counterparts.    This Agreement may be executed in counterparts with the same effect as if the parties executing such counterparts executed one counterpart as of the day and year first written above. This Agreement shall not be in effect unless all parties have executed this Agreement or a counterpart.

      IN WITNESS WHEREOF, the parties with the intent to be bound have executed this Agreement as of the date first set forth above.

Agreed to and accepted:

On behalf of
WORLD WRESTLING ENTERTAINMENT, INC.
("WWE")

By: _____
Ed Wells
SVP and Managing Director International
Date: ___10/22/2014___

On behalf of
CTH CONTENT COMPANY LIMITED
("Licensee")

By: ___METHIN SOMNUEK___
Print Name: Methin Somnuek
Title: Authorized Director
Date: ___15 Aug 2014___

*APPROVED BY CTH LEGAL DEPT*

14

# WORLD WRESTLING ENTERTAINMENT, INC.
## TELEVISION RIGHTS LICENSE AGREEMENT
## STANDARD TERMS AND CONDITIONS

### SECTION A.   PROVISIONS ON PAYMENT.

A(1)   <u>Terms of Payment</u>.   All payments made to WWE pursuant to this Agreement shall be made in US Dollars. Unless otherwise agreed to in writing Licensee shall pay WWE the total license fee due, whether or not the Programs are telecast, without any deduction or offset of any kind except as specified in the Agreement, and notwithstanding any claim Licensee may have or claim to have, and whether or not the Licensee becomes aware of such claim during or after the expiration or termination of this Agreement.

A(2)   <u>Payment Adjustments</u>. WWE's receipt or acceptance of any payments made to it by Licensee under this Agreement shall not preclude WWE from questioning the correctness of such payments at any time.  If any inconsistencies or mistakes are discovered in such payments, appropriate adjustments shall be made by Licensee within thirty (30) days of notice thereof. Licensee shall pay WWE interest on any late payment at the lesser of (i) an annual rate of 2% over the prevailing prime interest rate in effect at JP Morgan Chase, New York, New York, on the date on which the outstanding amount of such late payment should have been received by WWE or (ii) the highest amount of interest allowed by applicable law.

A(3)   <u>Method of Payment</u>.

(a)   All payments must be wired into WWE's account in accordance with the following instructions unless otherwise directed by WWE's SVP, Managing Director International or his designee:

**Wiring information:** Wire Transfer Account

JP Morgan Chase
270 Park Avenue
41st Floor
New York, NY 10017

ABA # 021000021
Swift Code:  CHASUS33
IBAN # 01021000021323415660
Customer Name: World Wrestling Entertainment, Inc.
Acct #  323-415660

APPROVED BY CTH LEGAL DEPT

Licensee shall send WWE by facsimile transmission copies of all wire transfer confirmations on the day any wire transfer to WWE is made. Such facsimile transmission should be sent to WWE _____, Attention: Ed Wells, SVP, Managing Director International or other such fax numbers as directed by WWE.

A(4)   <u>Blocked Currency</u>.  Licensee shall promptly notify WWE in writing if Licensee is prohibited or restricted from making payment of any amounts due WWE as a result of any laws or currency regulations of any country within Territory.  Upon receipt of any such notice, WWE shall have the right to direct Licensee promptly to (a) deposit the

15

amount due on behalf of WWE in a bank within the Territory designated by WWE; or (b) pay the amount due to a third party designated by WWE.

A(5)   Deductions; Taxes.   There shall be no deduction from the amounts paid to WWE for uncollectible accounts or for taxes (including any VAT or GST related to this Agreement) for fees, assessments, quotas, licenses, contingents, commissions, import or export taxes, import or export permits, similar levies, fees or charges imposed or levied or any other expenses of any kind. Licensee shall, at its sole expense, obtain the approval of any foreign authorities, take whatever steps may be required to effect the payment of funds; minimize or eliminate the incidence of taxes, fees or assessments which may be imposed. Notwithstanding the foregoing provision, if any country imposes a withholding tax against WWE with respect to the amounts payable to WWE by Licensee under this Agreement and such tax is paid by Licensee on behalf of WWE and such tax is an income tax as to which a foreign tax credit is allowed to WWE and appropriate documentation is delivered to WWE evidencing the deduction, then Licensee may deduct the amount of such withholding tax from the amounts owing to WWE. Licensee shall supply WWE all necessary tax forms to effect the foregoing deduction at least thirty (30) days prior to the date of WWE's first tax payment in each year of this Agreement.

SECTION B.   SUBTITLING; RESTRICTION ON EDITING.

B(1)   Subtitling.   Subject to broadcast regulations within the Territory, Licensee shall use its best efforts to broadcast each Program only in the precise form such Program is supplied by WWE, unedited and in the original language; provided, however that Licensee may provide subtitles and/or dubbing to the Programs if allowed under Section 2(a) ("Subtitle/Dubbing Work"). All Subtitle/Dubbing Work by Licensee or any third party shall be at Licensee's sole and absolute expense and responsibility, and shall be subject to WWE's approval as to voice-over talent and content (which, in any event, shall track the English version provided by WWE as closely as reasonably possible). At WWE's request and at Licensee's expense, Licensee shall provide WWE one (1) copy of the dubbed version of a selected Program created by Licensee. WWE may exploit such dubbed version.

B(2)   Restriction on Editing.   Licensee shall have the right to insert commercials within the natural breaks of the Programs. Licensee shall broadcast in connection with each Program all credits and copyright notices furnished by WWE. Licensee shall not authorize or permit any copying or duplication of any of the Programs, except as necessary for Licensee to broadcast the Program. Licensee shall not allow any materials incorporating the Programs or any portions thereof to leave its possession, custody and control except for the purpose of providing it for broadcast or subtitling. Except as specifically authorized by WWE, Licensee shall not make any cuts, changes or insertions in any of the Programs, except for the insertion of promos, commercials, and/or subtitling as set forth above and to the extent (and only to the extent) otherwise required by governmental censors and regulators within the Territory.

SECTION C.   PROMOTION, ADVERTISING, AND TRANSMISSION STATISTICS

C(1)   Promotional Efforts.   In consultation with WWE, Licensee shall promote the Programs within the Territory in a manner consistent with other similar programming currently being broadcast by Licensee.

APPROVED BY CTH LEGAL DEPT

16

C(2)   Uses of Names and Likenesses of Talent.  Licensee shall not use the names and/or likenesses of the Talent appearing in the Programs for any purpose other than advertising and promoting the Programs.  Licensee shall not use the names and/or likenesses of the Talent, the Events or the Programs so as to constitute an endorsement or testimonial, either expressed or implied, of any party, product, service or commercial venture.

C(3)   Promotion of WWE.  The Programs may promote, market and/or advertise WWE's WORLD WRESTLING ENTERTAINMENT, INC. brand, its television programs, home videos, CDs, the Talent, professional wrestling events, licensed merchandise, publications and any other of its or its affiliates products, goods or services as an integral part of the Programs' content.  However, these promotional mentions will not be in the form of actual commercials.

C(4)   Transmission Statistics.  Upon written request from WWE, Licensee shall inform WWE on no less than a quarterly basis of publicly available information with respect to transmissions of each of the Programs.

D.   MUSICAL COMPOSITIONS.

WWE represents that the performing rights in the music contained in each Program are controlled by BMI, ASCAP, SESAC, or another performing rights society having jurisdiction, are in the public domain, or are controlled by WWE to the extent necessary to permit Licensee's use of each Program in accordance with this Agreement.  Licensee shall report its uses of the music in the Programs to the applicable performing rights society or societies within the Territory.  At WWE's request, Licensee shall use reasonable efforts to provide WWE copies of reports and all other relevant information forwarded to the applicable performing rights society or societies.

E.   PRODUCTION, DELIVERY, LOSS OF OR DAMAGE TO TAPES AND RETURN OF MATERIALS.

E(1)   Sequential Programs.  With respect to the Sequential Programs, WWE shall deliver them to Licensee as follows:

E(2)   Delivery of Programs.  All Programs delivered by WWE to Licensee shall be of international broadcast quality, delivered via satellite with M & E track and English commentary.  WWE will make commercially reasonable efforts to deliver the Programs in a timely manner so as to sufficiently meet the Station's weekly air date schedule for the Programs.  Any and all costs and expenses incurred between the parties relative to the delivery of the Programs herein including uplink, space and downlink costs shall be borne by Licensee.

E(3)   Delivery of Advertising Materials. WWE shall from time to time deliver to Licensee, at WWE's sole cost and expense, certain Advertising Materials, as WWE shall select and determine in its sole discretion to promote the Programs.  All Advertising Materials shall be shipped directly to Licensee unless otherwise requested in writing by Licensee.

E(4)   Invoicing of Expenses and Payment of Expenses.  WWE shall invoice Licensee on a monthly basis for the expenses associated with the delivery of

17

Programs.  Licensee shall pay the expenses indicated in such invoices to WWE within thirty (30) days after receipt of that invoice.

E(5)    Failure to Meet Delivery Deadlines.  Failure by WWE to deliver any Program shall not constitute a breach under this Agreement.  If WWE fails to deliver a particular episode of a Program, Licensee, in its discretion, will determine whether it wishes to receive (x) a retransmission of the affected Program or Programs, or (y) a proportionate reduction in the license fee payable by Licensee to WWE.

E(6)    Annual Return of Materials.  Subject to legal requirements within the Territory, within thirty (30) days after the expiration of each calendar year and the termination of this Agreement, Licensee, at its expense (including the payment of customs duties or similar charges), shall use a reputable courier service to return all Programs that exist in tape form in Licensee's possession, including without limitation any and all subtitled/dubbed and/or edited versions thereof created by Licensee or its designee, to WWE, in good condition, normal wear and tear resulting from proper use thereof excepted.  In the alternative, Licensee may, on thirty (30) days' prior written notice to WWE (and provided Licensee does not receive contrary instructions from WWE), within sixty (60) days after the expiration of each Calendar Year and the expiration of this Agreement, destroy all Program tapes or Advertising Materials, provided that as a condition to exercising this alternative, Licensee provides an official certificate of destruction (in a form acceptable to WWE) sworn to by an officer of Licensee affirming the time and location of destruction, and acknowledging the compliance with Section K(2) and K(3) below. All costs associated with the destruction of the Program tapes and Advertising Materials shall be borne by Licensee.

E(7)    Loss of or Damage to Tapes.  Licensee shall be liable for loss or damage to any tapes of the Programs ("Tapes") while such Tapes are in Licensee's possession, custody and control.

F.    COPYRIGHTS; INFRINGEMENTS; TRADEMARKS.

F(1)    Copyright Notices.  The authorization by WWE to Licensee to broadcast the Programs and distribute the Advertising Materials is expressly conditioned upon Licensee's agreement not to delete from the Programs or Advertising Materials, the copyright notice or notices and all other Intellectual Property protection language included therein as delivered to Licensee by WWE.

F(2)    Assignment by Licensee.  Licensee sells, assigns and transfers to WWE its entire, worldwide right, title and interest in and to all "new works" or "derivative works" (including all Subtitle/Dubbing Work), as defined under the United States Copyright Act and all other such applicable laws,  previously or hereafter created, using, referencing or exploiting the Intellectual Property, including but not limited to the copyrights thereon and/or related to the Programs (collectively the "Works").  If parties who are not employees of Licensee, make or have made any contribution to the creation of the Works, so that such parties might be deemed to be "authors" of such Works as that term is used under present or future United States copyright statutes or other such applicable laws, Licensee shall obtain from such parties a full assignment of rights so that the foregoing assignment by Licensee vests in WWE full rights to, and interest in, the Works, free of any claims, interests or rights of other parties.  In particular, should Licensee obtain prior approval for Subtitle/Dubbing Work, then Licensee shall cause any individual retained by them to provide such work for the Program to execute a transfer of rights acknowledgment in the form set forth as Exhibit C

18

APPROVED BY CTH LEGAL DEPT

hereto.  Licensee shall not permit any of its employees to obtain or reserve by oral or written employment agreements any rights as "authors" of such Works.  Where Licensee fails to protect WWE's right, title and interest in the Programs, Licensee shall fully indemnify WWE from any loss, damage or injury incurred as a result thereof.  At WWE's request, Licensee shall furnish WWE any and all information concerning the creation of Works and copies of any and all assignments of rights obtained from the foregoing parties.

F(3)   Infringements.   When Licensee learns that a party is making unauthorized uses of the Intellectual Property, Licensee shall promptly notify WWE in writing giving full information with respect to the actions of such party. Licensee shall not make any demands or claims, bring suit, effect any settlements, or take any other action against such party without the prior written consent of WWE.  Licensee shall cooperate with WWE, at no out-of-pocket expense to Licensee, in connection with any action taken by WWE to terminate infringements.

F(4)   Trademark Uses Inure to WWE's Benefit.  All trademark uses of the Trademarks and other Intellectual Property by Licensee shall inure to the benefit of WWE and WWE shall own all trademarks and trademark rights created by such uses.  Licensee hereby assigns and transfers to WWE all trademarks and trademark rights created by such uses of the Trademarks and other Intellectual Property.

F(5)   Licensee Not to Assert Interest in Intellectual Property.  The Licensee shall not, during the Period of Agreement or thereafter, directly or indirectly assert any interest in or proprietary rights to any of the components of the Intellectual Property. Licensee will not, during the Period of Agreement or thereafter, contest the validity of the Intellectual Property or WWE's ownership of the Intellectual Property in any manner whatsoever.

F(6)   No Use of Initials WWF.  Licensee shall not use the initials "WWF" (in any form including any logo), the name or phrase "World Wrestling Federation" or any other words or considerations of words that could be shortened to the initials "WWF," in connection with the broadcasting of the Programs or in connection with the exploitation of the Advertising Materials.

SECTION G.  INDEMNIFICATIONS.

G(1)   Licensee Indemnification.  Licensee shall indemnify defend and hold WWE and its licensees, successors and assigns, parent corporation subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives (the "WWE Parties") harmless from any and all claims, liabilities, judgments, penalties, losses, costs (including reasonable attorneys' fees and an allocation of in house counsel fees and expenses and court costs), damages and expenses (collectively, "Costs") arising out of or in connection with (i) promoting, broadcasting, distributing and otherwise using and exploiting the Programs including, without limitation, marketing, selling and broadcasting advertising on the Programs as contemplated hereby (but excluding any claims based solely upon a third party's claim of right to the Intellectual Property as exploited in strict accordance with the terms of this Agreement);  (ii) the use and exploitation of the Advertising Materials as contemplated hereby (but excluding any claims based solely upon a third party's claim of right to the Intellectual Property as exploited in strict accordance with the terms of this Agreement) and/or (iii) the breach of this Agreement by Licensee, its employees, agents or representatives.

19

APPROVED BY CTH LEGAL DEPT.

G(2)   <u>WWE's Indemnification</u>.   WWE shall indemnify and hold Licensee harmless from any and all Costs arising out of a third party's claim of right to the Intellectual Property as exploited in strict accordance with the terms of this Agreement.

G(3)   <u>Claims Procedures</u>.   The obligations of the indemnifying party (the "Indemnitor") under this Section to the party entitled to indemnification (the "Indemnitee") with respect to any and all Costs associated with third party claims ("Third Party Claim") shall be subject to the following terms and conditions:   The Indemnitee will give the Indemnitor prompt notice of any Third Party Claim, and the Indemnitor will have the right to assume the defense, compromise or settlement thereof by representatives of its own choosing, at its own cost and expense, provided that the Indemnitee shall have the right (but not the obligation) to participate in such defense with its own counsel at its own expense and that no settlement will be agreed to without the Indemnitee's prior written consent.  The Indemnitee agrees not to withhold its consent to any settlement if the Indemnitor agrees to pay money damages, if any, and if the Indemnitee determines in good faith that such settlement will not otherwise have an adverse effect on the business, reputation or financial condition of the Indemnitee.  If the Indemnitor does not promptly assume such defense, the Indemnitee (upon notice to the Indemnitor) will have the right (but not the obligation) to undertake the defense, compromise or settlement of such Third Party Claim on behalf of and for the account and risk of the Indemnitor.

### SECTION H.  WARRANTY.

To the extent required to enable Licensee to exercise the rights granted herein, WWE acknowledges that it has secured the broadcasting and other necessary rights in and to the Programs and WWE has obtained the necessary clearances, releases and licenses with respect to the rights of any people appearing in or performing or providing services in connection with the Programs, including but not limited to Talent and the locations where Events are held.

### SECTION I.   RESERVATION OF RIGHTS.

All rights in and to the Programs and the Intellectual Property depicted within or derived therefrom are reserved by WWE for its own use, except for those specific rights which are granted to Licensee under this Agreement. WWE specifically reserves all rights within the Territory for any and all other WWE programming, whether now known or hereafter discovered that WWE produces which is not specifically and expressly licensed to Licensee under this Agreement.

### SECTION J.   FORCE MAJEURE.

If either party is prevented from performing its obligations hereunder as a result of a force majeure event, then the non-performing party shall not be liable to the other parties for its failure to perform such obligations. As used in this Agreement, force majeure shall mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order (including any trade embargo), or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations hereunder. In the case of a force majeure event, Licensee will not be responsible for the broadcast of the Programs that are affected during the occurrence of that force

APPROVED BY CTH LEGAL DEPT

WWE - CTH Content Company (Thailand 2014-2018) Long Form.doox

majeure event, and WWE may (if required by law) preclude Licensee from continuing to broadcast any Programs previously delivered.   Upon the resolution of that force majeure event, Licensee will resume its broadcast obligations as set forth herein and/or proceed as otherwise directed by WWE, in its sole discretion.

SECTION K.   BREACH AND TERMINATION.

K.(1)   Curable Breaches.   If Licensee breaches any of the material terms or provisions of this Agreement including, without limitation, any non-payment hereunder, and the Licensee fails to cure the breach within ten (10) days after receiving written notice from WWE specifying the particulars of the breach, WWE shall have the right to terminate this Agreement immediately by giving written notice to Licensee.

K.(2)   Effect of Termination.   Termination of this Agreement under the provisions of this Section K or the provisions set forth elsewhere in this Agreement shall be without prejudice to any rights or claims which WWE may otherwise have against the Licensee.   Without limiting the foregoing, upon the termination of this Agreement, all amounts due WWE by Licensee for Programs (i.e. the then remaining balance of the license fees due WWE as of the date of termination) shall become immediately due and payable to WWE.

K.(3)   Discontinuance of Use of Programs, Advertising Materials, Intellectual Property.   Upon the expiration or earlier termination of this Agreement, Licensee shall discontinue immediately and permanently all broadcast and other use of the Programs and the Advertising Materials; shall discontinue immediately and permanently the use of the Intellectual Property; shall terminate immediately all agreements with third parties that relate to the Programs; and shall return immediately to WWE or destroy (pursuant to Section E(6) above) all materials relevant to the Programs including without limitation Tapes for the Programs and Advertising Materials ("Materials").   Notwithstanding anything to the contrary herein, Licensee shall pay for all charges associated with the destruction of the Materials or return of the Materials to WWE.

K.(4)   Specific Performance.   Licensee agrees that irreparable injury, for which an adequate remedy at law does not exist, will occur to WWE if any of the provisions of this Agreement are not performed by Licensee in accordance with their specific terms. Accordingly, Licensee agrees that WWE will be entitled to an injunction or injunctions to prevent any breach or threatened breach of this Agreement and to enforce specifically the terms and provisions hereof in those courts having jurisdiction pursuant to Sections L(12) and L(13) below; this being in addition to any other remedy to which WWE may be entitled at law or in equity.

SECTION L.   MISCELLANEOUS PROVISIONS.

L.(1)   Restriction on Assignments.   Without the prior written consent of WWE (which consent may be withheld in WWE's sole discretion), Licensee shall not, directly or indirectly, assign, sublicense, hypothecate, convey, pledge, encumber or otherwise transfer ("Transfer") any of its rights under this Agreement. If Licensee is a corporation, limited partnership, limited liability company, business trust, general partnership or other business entity, a Transfer which requires the consent of WWE shall include without limitation (i) any assignment, sale, conveyance, transfer, hypothecation, pledge, encumbrance or other transfer of 50% or more of the stock, shares, limited partnership interests, general

21

partnership interests or other equity ownership interests (as appropriate) of Licensee within any consecutive 12 month period, (ii) the sale of all or substantially all of the assets of Licensee, (iii) any merger, consolidation or reorganization into or with the assignor, regardless of whether Licensee is the surviving entity and (iv) any other action or event which would constitute a transfer of the benefits of this Agreement by operation or force of law. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of WWE.

L(2)   Parties Not Joint Venturers.  At all times the parties hereto shall be considered independent contractors and this Agreement shall not create an agency, partnership or employment relationship between the parties and nothing contained in this Agreement shall be construed so as to make the parties partners or joint venturers or to permit the Licensee to bind WWE to any agreement or purport to act on behalf of WWE in any respect.

L(3)   Modifications of Agreement; Remedies.  No waiver or modification of any of the terms of this Agreement shall be valid unless embodied in a writing signed by the respective duly authorized representatives of the party to be bound thereby.  The failure of either party to enforce any rights under this Agreement shall not be construed as a continuing waiver or as a waiver in other instances.

L(4)   No Waiver of Rights.  The waiver, expressed or implied, by WWE of any rights hereunder shall not constitute or be deemed a waiver of any of WWE's other rights hereunder or a continuing waiver of such provision, and such rights shall be exercisable when it is deemed appropriate by WWE.

L(5)   Severability:  If any provision or clause of this Agreement, or portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable in such jurisdiction, the remainder of this Agreement (including any portion of such provision that is not held unenforceable) shall not thereby be affected and shall be given full effect, without regard to the invalid portion.  It is the intention of the parties that, if any court construes any provisions or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

L(6)   Notices.  All notices to be given under this Agreement shall be in writing and shall be delivered either by personal delivery, regular mail, international courier, or facsimile (provided that a copy of such notice is also given by mail on the same day) at the respective addresses of the parties as set forth below, unless notification of a change of address is given in writing.  Notice given by regular mail shall be deemed given on the date which is five days after its deposit in the mail system and notice given by facsimile shall be deemed given on the date of confirmation of receipt of such facsimile (provided a copy of such notice is also sent by regular mail).

Copies of notices to WWE shall go to:

World Wrestling Entertainment, Inc.
1241 East Main Street
Stamford, CT 06902

*APPROVED BY CTH LEGAL DEPT*

22

Attn:    General Counsel

With a copy to:

World Wrestling Entertainment, Inc.
1241 East Main Street
Stamford, CT 06902

Attn:    Ed Wells
SVP, Managing Director International

Copies of notices to Licensee shall go to:

CTH Content Company Limited
96/1 Chalermprakiat Ror 9 Road
Nong Bon, Prawet
Bangkok 10250, Thailand

Attn: Ms. Piangpen Toommanon

L(7)    Headings.  The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

L(8)    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

L(9)    Entire Understanding.    This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes any and all prior agreements or understandings between the parties with respect to the subject matter hereof, whether written or oral.

L(10)    Interpretation.  Each party, with the assistance of its respective counsel, has read this Agreement and has had the opportunity to negotiate fully its terms. Accordingly, any rule of construction seeking to resolve ambiguities against the drafting party shall not apply to the interpretation of this Agreement.

L(11)    No Third Party Beneficiaries.  No person or entity is an intended third party beneficiary to this Agreement.

L(12)    Governing Law:    This Agreement has been made in Connecticut.  All disputes, claims or legal actions arising directly or indirectly out of this Agreement or relating in any way to the subject matter of this Agreement or the parties' relationship, whether sounding in contract, tort or otherwise, shall be governed by the laws of the State of Connecticut, exclusive of the Connecticut laws relating to the conflicts of laws.    The provisions contained in Section L(12) shall survive the termination and/or expiration of this Agreement.

L(13)    Forum Selection and Jurisdiction:  The United States District Court for District of Connecticut and the Judicial District Court of Stamford, Connecticut are the

23

exclusive forums in which a party may bring any dispute, claim or legal action arising directly or indirectly out of this Agreement or in any way related to the subject matter of this Agreement or the parties' relationship, whether sounding in contract, tort or otherwise. This provision to submit all disputes, claims or legal actions to the Federal or State courts in Connecticut shall be specifically enforceable; each party knowingly waives personal service of process and venue; and each party consents to jurisdiction in Connecticut and waives any defense of forum nonconveniens or similar defense to such forum. The provisions contained in this paragraph shall survive the termination and/or expiration of this Agreement.

L(14)   Disclaimer.   WWE shall not be liable to Licensee for any indirect, incidental, reliance, special or consequential damages (including, but not limited to, lost profits, advertising or revenue) arising out of or related to a breach by WWE of any of the terms of this Agreement, however caused and by any theory whatsoever (including, without limitation, negligence of any kind or degree) and regardless of whether WWE has been advised of the possibility of such damages or whether such damages were foreseeable.

L(15)   (a) Confidential Information. During   the   Period   of   Agreement, Licensee may have access to confidential information of WWE including, without limitation, software (regardless of the stage of development), designs, drawings, specifications, models, technical information, unreleased or undisclosed Intellectual Property, hardware, source codes, object codes, documentation diagrams, flow charts, marketing and development plans, business plans or records, financial information, market reports, customer lists, talent lists, story lines, scripts, story boards or ideas, employee lists, business manuals, policies and procedures, the terms and conditions of this Agreement, billing information and procedures and all other proprietary information ("Confidential Information).   During the Period of Agreement and for a period of five (5) years after the expiration or termination of this Agreement for any reason whatsoever, Licensee (as defined in Section 6 of the Agreement) shall hold Confidential Information in confidence, employing the same degree of care that it employs for its own proprietary information.   The Licensee shall not make Confidential Information available in any form to any third party or use Confidential Information for any purposes other than for the implementation of this Agreement.

(b)   Notwithstanding the foregoing, the Licensee's obligations of confidentiality shall not include information which:

(i) is available to the public other than through any act or omission by the Licensee; or

(ii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to WWE in a timely manner in order to afford WWE an opportunity to seek a protective order against such disclosure and the disclosure is strictly limited to the information which is required or compelled to be disclosed.

L(16)   Binding Effect.      The parties represent and warrant that the person executing this Agreement has the authority to bind the party on behalf of which he/she is signing.

24

Exhibit A

| Program | Channel | Day and Time Slot |
|---|---|---|
| 3 Hour Raw | | |
| SmackDown | | |
| Main Event | | |
| Superstars | | |
| NXT | | |
| BottomLine | | |
| AfterBurn | | |
| Vintage Collection | | |
| WWE Experience | | |
| This Week in WWE | | |
| PPV | | |

*APPROVED BY CTH LEGAL DEPT*

25

<u>Exhibit B</u>

<u>Predetermined Order of WWE Programming</u>

RAW

WWE NXT

WWE SUPERSTARS

WWE MAIN EVENT

SMACKDOWN

BOTTOMLINE

AFTERBURN

THE WWE EXPERIENCE

THIS WEEK IN WWE

WWE VINTAGE COLLECTION

SPECIALS

     For the purposes of clarity, the parties hereto reiterate and agree that each episode including replays must be broadcast in a manner that does not disturb the foregoing programming schedule order and furthermore does not disturb the sequential, episodic nature of each episode of the individual programs identified herein.

     It is acknowledged that WWE may change this order from time to time as to one or more shows, and may waive the requirement of sequencing as to one or more shows by any licensee thereof, and the Licensee has no control over the sequencing of the shows in the Territory.

*APPROVED BY CTH LEGAL DEPT*

26

### Exhibit C

Transfer of Rights Acknowledgment

The undersigned individual (hereinafter referred to as "Talent") has been retained to provide voice-overs, in the _____ language, for WORLD WRESTLING ENTERTAINMENT, INC. television programs (the "Programs"), all worldwide rights to which are owned by WWE Sports, Inc., Stamford, Connecticut, U.S.A. ("WWE"). Talent confirms that all of Talent's appearances and services in connection with and all of Talent's contributions to the Programs (said appearances, services, and contributions being hereinafter collectively referred to as the "Contributions") shall be the property of WWE. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Talent hereby assigns to WWE all Talent's worldwide right, title, and interest in and to the Contributions, including, but not limited to, the worldwide copyrights in the Contributions. WWE shall have the unlimited right, in perpetuity, to exploit the Contributions in any and all forms and media, and in connection with such exploitation to use, and to authorize others to use, Talent's name, likeness, image, biography, voice, signature, caricatures, characteristics, costumes, and any other materials associated with or contained in the Contributions or associated with Talent.

_____
Talent

_____

APPROVED BY CTH LEGAL DEPT

WWE – CTH Content Company (Thailand 2014-2018) Long Form.docx

EXHIBIT 2



**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

**World Wrestling Entertainment®**

| INVOICE | |
|---|---|
| Invoice No. | 95755 |
| Contract No. | 1339 TC |
| Date | 03/01/14 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 2 OF 5 |

**BILL TO:**
CABLE THAI HOLDINGS PUBLIC
COMPANY LIMITED (CTH)
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250

Page  1 of 1

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| | 560,000.00 |

RAW (3HR)52 EPISODES @ $13,461.54/EACHEPISODE (#1075-1126)

SMACKDOWN (2HR)52 EPISODES @ $10,769.23/EACH EPISODE (#750-801) MAIN EVENT 52 EPISODES @ $5,384.62/EACH EPISODE (#66-117)

SUPERSTARS 52 EPISODES @ $5,384.62/EACH EPISODE (#247-298)

NXT 52 EPISODES @ $1,615.38/EACH EPISODE (#202-253)

BOTTOMLINE 52 EPISODES @ $2,692.31/EACH EPISODE (#607-658)

AFTERBURN 52 EPISODES @ $5,384.62/EACH EPISODE (#607-658)

VINTAGE COLLECTION 52 EPISODES @ $1,076.92/EACH EPISODE (#292-343)

WWE EXPERIENCE 52 EPISODES @ $2,692.31/EACH EPISODE (#506-557)

THIS WEEK 52 EPISODES @ $2,692.31/EACH EPISODE (#258-309)

PPVSPECILAS

12 EPISODES @ $11,666.67/EACH

EPISODE (#1-12)

THAILAND

**PLEASE WIRE FUNDS AS FOLLOWS:**
JP MORGAN CHASE
270 PARK AVENUE
41ST FLOOR
NEW YORK,NY  10017
SWIFT CODE:CHASUS33
ABA # 021000021
TO FURTHER CREDIT
CUSTOMER NAME: WORLD WRESTLING ENTERTAINMENT, INC.
ACCT# 323-415660
*PLEASE REFERENCE INVOICE NUMBERS

| | |
|---|---|
| Sales Total: | 560,000.00 |
| Tax Total: | 0.00 |
| Total Amount Due: | 560,000.00 |

**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| INVOICE | |
|---|---|
| Invoice No. | 97598 |
| Contract No. | 1339 TC |
| Date | 06/01/14 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 3 OF 5 |

**BILL TO:**
CTH Content Company Limited
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250
Thailand

Page  1 of 1

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| | 560,000.00 |

RAW (3HR)52 EPISODES @ $13,461.54/EACHEPISODE (#1075-1126)

SMACKDOWN (2HR)52 EPISODES @ $10,769.23/EACH EPISODE (#750-801) MAIN EVENT 52 EPISODES @ $5,384.62/EACH EPISODE (#66-117)

SUPERSTARS 52 EPISODES @ $5,384.62/EACH EPISODE (#247-298)

NXT 52 EPISODES @ $1,615.38/EACH EPISODE (#202-253)

BOTTOMLINE 52 EPISODES @ $2,692.31/EACH EPISODE (#607-658)

AFTERBURN 52 EPISODES @ $5,384.62/EACH EPISODE (#607-658)

VINTAGE COLLECTION 52 EPISODES @ $1,076.92/EACH EPISODE (#292-343)

WWE EXPERIENCE 52 EPISODES @ $2,692.31/EACH EPISODE (#506-557)

THIS WEEK 52 EPISODES @ $2,692.31/EACH EPISODE (#258-309)

PPVSPECILAS

12 EPISODES @ $11,666.67/EACH

EPISODE (#1-12)


THAILAND

**PLEASE WIRE FUNDS AS FOLLOWS:**
JP MORGAN CHASE
270 PARK AVENUE
41ST FLOOR
NEW YORK,NY  10017
SWIFT CODE:CHASUS33
ABA # 021000021
TO FURTHER CREDIT
CUSTOMER NAME: WORLD WRESTLING ENTERTAINMENT, INC.
ACCT# 323-415660
*PLEASE REFERENCE INVOICE NUMBERS

| | |
|---|---|
| Sales Total: | 560,000.00 |
| Tax Total: | 0.00 |
| Total Amount Due: | 560,000.00 |

**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| | INVOICE |
|---|---|
| Invoice No. | 99127 |
| Contract No. | 1339 TC |
| Date | 08/01/14 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 4 OF 5 |

**BILL TO:**
CTH Content Company Limited
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250
Thailand

Page 1 of 1

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| | 560,000.00 |

RAW (3HR)52 EPISODES @ $13,461.54/EACHEPISODE (#1075-1126)

SMACKDOWN (2HR)52 EPISODES @ $10,769.23/EACH EPISODE (#750-801) MAIN EVENT 52 EPISODES @ $5,384.62/EACH EPISODE (#66-117)

SUPERSTARS 52 EPISODES @ $5,384.62/EACH EPISODE (#247-298)

NXT 52 EPISODES @ $1,615.38/EACH EPISODE (#202-253)

BOTTOMLINE 52 EPISODES @ $2,692.31/EACH EPISODE (#607-658)

AFTERBURN 52 EPISODES @ $5,384.62/EACH EPISODE (#607-658)

VINTAGE COLLECTION 52 EPISODES @ $1,076.92/EACH EPISODE (#292-343)

WWE EXPERIENCE 52 EPISODES @ $2,692.31/EACH EPISODE (#506-557)

THIS WEEK 52 EPISODES @ $2,692.31/EACH EPISODE (#258-309)

PPVSPECILAS

12 EPISODES @ $11,666.67/EACH

EPISODE (#1-12)

THAILAND

**PLEASE WIRE FUNDS AS FOLLOWS:**
JP MORGAN CHASE
270 PARK AVENUE
41ST FLOOR
NEW YORK,NY  10017
SWIFT CODE:CHASUS33
ABA # 021000021
TO FURTHER CREDIT
CUSTOMER NAME: WORLD WRESTLING ENTERTAINMENT, INC.
ACCT# 323-415660
*PLEASE REFERENCE INVOICE NUMBERS

| | |
|---|---|
| **Sales Total:** | 560,000.00 |
| **Tax Total:** | 0.00 |
| **Total Amount Due:** | 560,000.00 |



**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| INVOICE | |
|---|---|
| Invoice No. | 100786 |
| Contract No. | 1339 TC |
| Date | 10/01/14 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 5 OF 5 |

**BILL TO:**
CTH Content Company Limited
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250
Thailand

Page  1 of 1

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| | 560,000.00 |

RAW (3HR)52 EPISODES @ $13,461.54/EACHEPISODE (#1075-1126)

SMACKDOWN (2HR)52 EPISODES @ $10,769.23/EACH EPISODE (#750-801) MAIN EVENT 52 EPISODES @ $5,384.62/EACH EPISODE (#66-117)

SUPERSTARS 52 EPISODES @ $5,384.62/EACH EPISODE (#247-298)

NXT 52 EPISODES @ $1,615.38/EACH EPISODE (#202-253)

BOTTOMLINE 52 EPISODES @ $2,692.31/EACH EPISODE (#607-658)

AFTERBURN 52 EPISODES @ $5,384.62/EACH EPISODE (#607-658)

VINTAGE COLLECTION 52 EPISODES @ $1,076.92/EACH EPISODE (#292-343)

WWE EXPERIENCE 52 EPISODES @ $2,692.31/EACH EPISODE (#506-557)

THIS WEEK 52 EPISODES @ $2,692.31/EACH EPISODE (#258-309)

PPVSPECILAS

12 EPISODES @ $11,666.67/EACH

EPISODE (#1-12)

THAILAND

**PLEASE WIRE FUNDS AS FOLLOWS:**
JP MORGAN CHASE
270 PARK AVENUE
41ST FLOOR
NEW YORK,NY  10017
SWIFT CODE:CHASUS33
ABA # 021000021
TO FURTHER CREDIT
CUSTOMER NAME: WORLD WRESTLING ENTERTAINMENT, INC.
ACCT# 323-415660
*PLEASE REFERENCE INVOICE NUMBERS

| Sales Total: | 560,000.00 |
|---|---|
| Tax Total: | 0.00 |
| Total Amount Due: | 560,000.00 |



**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| INVOICE | |
|---|---|
| Invoice No. | 102403 |
| Contract No. | 1340 TC |
| Date | 01/01/15 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 1 OF 5 |

**BILL TO:**
CABLE THAI HOLDINGS PUBLIC
COMPANY LIMITED (CTH)
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250

Page  1 of 2

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| | 728,000.00 |

RAW (3HR)
52 EPISODES @ $17,500/EACH EPISODE (#1127-1178)

SMACKDOWN (2HR)
52 EPISODES @ $14,000/EACH
EPISODE (#802-853)

MAIN EVENT
52 EPISODES @ $7,000/EACH
EPISODE (#118-169)

SUPERSTARS
52 EPISODES @ $7,000/EACH
EPISODE (#299-350)

NXT
52 EPISODES @ $2,100/EACH
EPISODE (#254-305)

BOTTOMLINE
52 EPISODES @ $3,500/EACH
EPISODE (#659-710)

AFTERBURN
52 EPISODES @ $7,000.00/EACH
EPISODE (#659-710)

VINTAGE COLLECTION
52 EPISODES @ $1,400.00/EACH
EPISODE (#344-395) WWE EXPERIENCE
52 EPISODES @ $3,500.00/EACH
EPISODE (#558-609)

THIS WEEK
52 EPISODES @ $3,500.00/EACH
EPISODE (#310-361)

PPVSPECILAS
12 EPISODES @ $15,166.67/EACH
EPISODE (#1-12)

THAILAND



**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| | **INVOICE** |
|---|---|
| Invoice No. | 102403 |
| Contract No. | 1340 TC |
| Date | 01/01/15 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 1 OF 5 |

**BILL TO:**
CABLE THAI HOLDINGS PUBLIC
COMPANY LIMITED (CTH)
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250

Page  2 of 2

| DESCRIPTION | EXTENDED PRICE |
|---|---|

**PLEASE WIRE FUNDS AS FOLLOWS:**
**JP MORGAN CHASE**
**270 PARK AVENUE**
**41ST FLOOR**
**NEW YORK,NY  10017**
**SWIFT CODE:CHASUS33**
**ABA # 021000021**
**TO FURTHER CREDIT**
**CUSTOMER NAME: WORLD WRESTLING ENTERTAINMENT, INC.**
**ACCT# 323-415660**
**\*PLEASE REFERENCE INVOICE NUMBERS**

| | |
|---|---|
| **Sales Total:** | 728,000.00 |
| **Tax Total:** | 0.00 |
| **Total Amount Due:** | 728,000.00 |



**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| INVOICE | |
|---|---|
| Invoice No. | 102901 |
| Contract No. | 1340 TC |
| Date | 03/01/15 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 2 OF 5 |

**BILL TO:**
CABLE THAI HOLDINGS PUBLIC
COMPANY LIMITED (CTH)
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250

Page  1 of 2

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| | 728,000.00 |

RAW (3HR)
52 EPISODES @ $17,500/EACH EPISODE (#1127-1178)

SMACKDOWN (2HR)
52 EPISODES @ $14,000/EACH
EPISODE (#802-853)

MAIN EVENT
52 EPISODES @ $7,000/EACH
EPISODE (#118-169)

SUPERSTARS
52 EPISODES @ $7,000/EACH
EPISODE (#299-350)

NXT
52 EPISODES @ $2,100/EACH
EPISODE (#254-305)

BOTTOMLINE
52 EPISODES @ $3,500/EACH
EPISODE (#659-710)

AFTERBURN
52 EPISODES @ $7,000.00/EACH
EPISODE (#659-710)

VINTAGE COLLECTION
52 EPISODES @ $1,400.00/EACH
EPISODE (#344-395) WWE EXPERIENCE
52 EPISODES @ $3,500.00/EACH
EPISODE (#558-609)

THIS WEEK
52 EPISODES @ $3,500.00/EACH
EPISODE (#310-361)

PPVSPECILAS
12 EPISODES @ $15,166.67/EACH
EPISODE (#1-12)

THAILAND



**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| INVOICE | |
|---|---|
| Invoice No. | 102901 |
| Contract No. | 1340 TC |
| Date | 03/01/15 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 2 OF 5 |

**BILL TO:**
CABLE THAI HOLDINGS PUBLIC
COMPANY LIMITED (CTH)
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250

Page  2 of 2

| DESCRIPTION | EXTENDED PRICE |
|---|---|

**PLEASE WIRE FUNDS AS FOLLOWS:**
JP MORGAN CHASE
270 PARK AVENUE
41ST FLOOR
NEW YORK,NY  10017
SWIFT CODE:CHASUS33
ABA # 021000021
TO FURTHER CREDIT
CUSTOMER NAME: WORLD WRESTLING ENTERTAINMENT, INC.
ACCT# 323-415660
*PLEASE REFERENCE INVOICE NUMBERS

| | |
|---|---|
| **Sales Total:** | 728,000.00 |
| **Tax Total:** | 0.00 |
| **Total Amount Due:** | 728,000.00 |



**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| INVOICE | |
|---|---|
| Invoice No. | 104680 |
| Contract No. | 1340 TC |
| Date | 06/01/15 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 3 OF 5 |

**BILL TO:**
CABLE THAI HOLDINGS PUBLIC
COMPANY LIMITED (CTH)
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250

Page  1 of 2

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| | 728,000.00 |

RAW (3HR)
52 EPISODES @ $17,500/EACH EPISODE (#1127-1178)

SMACKDOWN (2HR)
52 EPISODES @ $14,000/EACH
EPISODE (#802-853)

MAIN EVENT
52 EPISODES @ $7,000/EACH
EPISODE (#118-169)

SUPERSTARS
52 EPISODES @ $7,000/EACH
EPISODE (#299-350)

NXT
52 EPISODES @ $2,100/EACH
EPISODE (#254-305)

BOTTOMLINE
52 EPISODES @ $3,500/EACH
EPISODE (#659-710)

AFTERBURN
52 EPISODES @ $7,000.00/EACH
EPISODE (#659-710)

VINTAGE COLLECTION
52 EPISODES @ $1,400.00/EACH
EPISODE (#344-395) WWE EXPERIENCE
52 EPISODES @ $3,500.00/EACH
EPISODE (#558-609)

THIS WEEK
52 EPISODES @ $3,500.00/EACH
EPISODE (#310-361)

PPVSPECILAS
12 EPISODES @ $15,166.67/EACH
EPISODE (#1-12)

THAILAND



**World Wrestling Entertainment, Inc.**
1241 East Main Street
Stamford, CT 06902
PHONE: 203-352-6000
FAX: 203-352-8688

| | INVOICE |
|---|---|
| Invoice No. | 104680 |
| Contract No. | 1340 TC |
| Date | 06/01/15 |
| Customer ID | 133154 |
| Term | Net 30 Days |
| Currency | USD |
| Installment | 3 OF 5 |

**BILL TO:**
CABLE THAI HOLDINGS PUBLIC
COMPANY LIMITED (CTH)
96/1 CHALERMPRAKIAT ROR 9 RD
NONG BON, PRAWET
ATTN: ACCOUNTS PAYABLE
BANGKOK  10250

Page  2 of 2

| DESCRIPTION | EXTENDED PRICE |
|---|---|

**PLEASE WIRE FUNDS AS FOLLOWS:**
JP MORGAN CHASE
270 PARK AVENUE
41ST FLOOR
NEW YORK,NY  10017
SWIFT CODE:CHASUS33
ABA # 021000021
TO FURTHER CREDIT
CUSTOMER NAME: WORLD WRESTLING ENTERTAINMENT, INC.
ACCT# 323-415660
*PLEASE REFERENCE INVOICE NUMBERS

| | |
|---|---|
| **Sales Total:** | 728,000.00 |
| **Tax Total:** | 0.00 |
| **Total Amount Due:** | 728,000.00 |

EXHIBIT 3



1241 East Main Street
Stamford, CT 06902

VIA FAX AND REGULAR MAIL

October 23, 2014

CTH Content Company Limited
96/1 Chalermprakiat Ror 9 Road
Nong Bon, Prawet
Bangkok 10250, Thailand

Attn: Ms. Piangpen Toommanon

Re:   International Television Rights License Agreement dated as of November 1, 2013 (the
      "Agreement") between World Wrestling Entertainment, Inc. ("WWE") and CTH Content
      Company Limited ("CTH")

Dear Ms. Toommanon:

Following up on Ed Wells' e-mails to you and CTH's CEO as well as our other attempts in good
faith to contact CTH regarding its repeated failure to make payments required by Section 4 of the
Agreement and as required by CTH's own proposed payment schedule, this will confirm that in
accordance with Section K(1) of the Agreement, this letter shall constitute notice that CTH is in
breach of the Agreement for non-payment of outstanding License Fee payments currently
totaling $2,240,000.

In the event that payment is not made within ten (10) days, we shall be left with no choice but to
pursue legal remedies in order to enforce our rights under the Agreement.

Nothing contained in or omitted from this letter shall constitute a waiver of our rights and
remedies, all of which are expressly reserved.

Sincerely,

Jeffrey Daitch
Vice President, International Business and Legal Affairs
WWE, Inc.

EXHIBIT 4



LS HORIZON
ATTORNEYS-AT-LAW

22 May 2015

*BY REGISTERED MAIL*

TO:     **CTH Content Company Limited**
        96/1 Chaloem Phrakiat Ror 9 Road
        Nong Bon Sub-district, Prawet District
        Bangkok 10250, Thailand

        **Attention:  Mr. Methin Somnuek (Director)**
                    **Ms. Wiorn Thongtang (Director)**
                    **Mr. Kittsanan Ngamphathipong (CEO)**
                    **Ms. Piangpen Toommanon (SPV-CCA)**

CC:     **CTH Public Company Limited**
        96/1 Chaloem Phrakiat Ror 9 Road
        Nong Bon Sub-district, Prawet District
        Bangkok 10250, Thailand

        **Attention:  Chief Executive Officer**

Reference:   (1)    WWE Deal Memo dated 1 November 2013 between World Wrestling
                    Entertainment, Inc. (**"WWE"**) and CTH Content Company Limited
                    (**"CTHC"**);

             (2)    World Wrestling Entertainment, Inc. International Television Rights
                    License Agreement dated 1 November 2013 between WWE and CTHC
                    (the **License Agreement"**); and

             (3)    World Wrestling Entertainment, Inc. Television Rights License
                    Agreement Standard Terms and Conditions.

                    (collectively the **"Agreements"**)

*Re: Demand for Payment of License Fee*

Dear Sirs,

We are instructed and authorized by our client, WWE, to serve this demand letter on CTHC in
respect of the Agreements which CTHC entered into with WWE for broadcasting of the contents
to be provided by and under license of WWE, and CTHC agreed to pay license fee to WWE in
accordance with the payment terms as agreed under the Agreements.

On behalf of WWE, we remind again that CTHC is bound to pay the license fee to WWE in accordance with the payment terms set out in Clause 4 of the License Agreement. However, our client advised that CTHC has been ignoring and continued to be in default of its payment obligations that, as of the date hereof, the aggregate principal amount due but unpaid by CTHC is 3,696,000 USD, despite several demands made by WWE.

Therefore, on behalf of WWE, we hereby demand CTHC to pay WWE the followings:

(1)     the aggregate principal amount due and payable of USD 3,696,000 being the unpaid license fee; and

(2)     the interest accrued thereon on late payment of this principal amount at the rate prescribed in Section A(2) of the standard terms and calculated from the due date of each license fee until all payment is made in full.

The payment of the total outstanding amount shall be made to WWE within 15 days upon the first receipt of this letter by CTHC.

In the event that CTHC fails to make payment in full, WWE considers it is necessary to commence legal action against CTHC without prior notice to recover the outstanding license fee and accrued interest including any and all damages legally entitled by WWE.

The issuance of this letter shall not prejudice any other rights, remedies and claims to which WWE is entitled under the Agreements and applicable law.

Yours sincerely,
**LS Horizon Limited**

**Ms. Oranat Chantara-opakorn**
**Lawyer**

2



LS HORIZON
ATTORNEYS-AT-LAW

22 May 2015

*BY REGISTERED MAIL*

TO:     **CTH Public Company Limited**
        96/1 Chaloem Phrakiat Ror 9 Road
        Nong Bon Sub-district, Prawet District
        Bangkok 10250, Thailand

        **Attention:  Chief Executive Officer**

CC:     **CTH Content Company Limited**
        96/1 Chaloem Phrakiat Ror 9 Road
        Nong Bon Sub-district, Prawet District
        Bangkok 10250, Thailand

        **Attention:  Chief Executive Officer**

Reference:     (1)     WWE Deal Memo dated 1 November 2013 between World Wrestling Entertainment, Inc. ("**WWE**") and CTH Content Company Limited ("**CTHC**");

               (2)     World Wrestling Entertainment, Inc. International Television Rights License Agreement dated 1 November 2013 between WWE and CTHC (the "**License Agreement**"); and

               (3)     World Wrestling Entertainment, Inc. Television Rights License Agreement Standard Terms and Conditions.

                       (collectively the "**Agreements**")

*Re: Demand for Payment of License Fee*

Dear Sirs,

We are instructed and authorized by our client, WWE, to serve this demand letter on CTH Public Company Limited ("**CTH**") in respect of the Agreements which CTHC entered into with WWE for broadcasting of the contents to be provided by and under license of WWE, and CTHC agreed to pay license fee to WWE in accordance with the payment terms as agreed under the Agreements.

On behalf of WWE, we are writing to notify that CTH, as the parent company of CTHC and which directly gained benefit together with CTHC from the contents provided by WWE, is jointly and severally with CTHC obliged to pay the license fee to WWE in accordance with the payment terms set out in Clause 4 of the License Agreement. However, our client advised that both CTH and CTHC have been ignoring and continued to be in default of its payment obligations that, as of the date hereof, the aggregate principal amount due but unpaid is 3,696,000 USD, despite several demands made by WWE.

Therefore, on behalf of WWE, we hereby demand CTH, as a joint debtor, to pay WWE the followings:

(1)     the aggregate principal amount due and payable of USD 3,696,000 being the unpaid license fee; and

(2)     the interest accrued thereon on late payment of this principal amount at the rate prescribed in Section A(2) of the standard terms and calculated from the due date of each license fee until all payment is made in full.

The payment of the total outstanding amount shall be made to WWE within 15 days upon the first receipt of this letter by CTH.

In the event that CTH fails to make payment in full, WWE considers it is necessary to commence legal action against CTH and CTHC without prior notice to recover the outstanding license fee and accrued interest including any and all damages legally entitled by WWE.

The issuance of this letter shall not prejudice any other rights, remedies and claims to which WWE is entitled under the Agreements and applicable law.

Yours sincerely,
**LS Horizon Limited**

**Ms. Oranat Chantara-opakorn**
**Lawyer**

2

# EXHIBIT 5



August 13, 2015

**WWE**
1241 East Main Street
Stamford, CT 06902

## VIA FACSIMILE AND INTERNATIONAL COURIER

CTH Content Company Limited
96/1 Chalermprakiat Ror 9 Road
Nong Bon, Prawet
Bangkok 10250, Thailand
Attn: Mr. Amarit Sukhavanij

Re:   Notice of Termination of International Television Rights License Agreement dated as of
November 1, 2013 (the "Agreement") between World Wrestling Entertainment, Inc. ("WWE")
and CTH Content Company Limited ("CTH")

Dear Mr. Sukhavanij:

Pursuant to Section K(1) of the Agreement, this letter shall constitute formal notice that WWE hereby terminates the Agreement immediately based upon CTH's material breaches of the Agreement and failure to cure those breaches, including without limitation CTH's non-payment of License Fees due under the Agreement.

Pursuant to Section K(2) of the Agreement, all License Fees due to WWE under the Agreement shall become immediately due and payable to WWE by CTH.  The remaining balance of unpaid License Fees under the Agreement totals $22,942,500, which includes $5,152,000 in License Fees that were already past due and owed by CTH.  CTH is also liable to WWE for fees and interest on past due amounts in accordance with the Agreement.

Pursuant to Section K(3) of the Agreement, CTH shall discontinue immediately and permanently all broadcast or other use of the Programs and the Advertising Materials and the use of the Intellectual Property and shall terminate immediately all agreements with third parties that relate to the Programs.  CTH shall also return immediately to WWE or destroy all materials relevant to the Programs, including without limitation Tapes for the Programs and Advertising Materials and shall pay for all charges associated with the destruction of the Materials or return of the Materials to WWE.

WWE will consider a mutual agreement to unwind the termination of the Agreement and to continue to provide content to CTH only if CTH pays all outstanding amounts and interest due  immediately and contacts WWE to coordinate wire payment of such amounts immediately.

This letter shall not constitute a waiver of any rights or remedies that WWE may have against CTH, all of which are expressly reserved.

Very truly yours,

Gerrit Meier
President, International, WWE Inc.